**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

AMERICAN FEDERATION OF TEACHERS -
WEST VIRGINIA, AFL-CIO, et al.,
                              Petitioners,

v.                                          CIVIL ACTION NO.  2:08-cv-01406

KANAWHA COUNTY BOARD OF EDUCATION, et al.,

                    Respondents.


**MEMORANDUM OPINION**

      The Kanawha County School Board adopted a revised drug testing policy mandating the random testing of teachers and other categories of public school employees.  The teachers' unions have joined forces in this lawsuit seeking to enjoin the implementation of that policy on constitutional and privacy grounds.  The questions before the court are whether the random drug testing policy adopted by the Board as a state actor violates the Fourth Amendment to the United States Constitution, Article III, § 6 of the West Virginia Constitution, and the right to privacy as it is recognized in this state.  The evidence does not demonstrate either that these employees have a reduced expectation of privacy by virtue of their employment in a public school or that there is a special governmental need to guard against a concrete risk of great harm.  I therefore find that because the safety justification offered by the Board does not outweigh the privacy interests of the school employees, the Board may not abandon the Fourth Amendment's protection against suspicionless searches.  Consequently, the plaintiffs are likely to succeed on the merits of their claims and I preliminarily enjoin the enforcement of the random drug testing policy.

## I. Factual Background and Procedural History

The Kanawha County Board of Education has attempted to deal with the problem of drug abuse in the workplace by fashioning an Employee Drug Use Prevention Policy.  (Hr'g 12/29/08, Pet'rs' Ex. 1 [Docket 24].)  The Policy originally enacted on December 13, 2007, provides for drug testing of Kanawha County Schools employees in the following six situations: pre-employment (§ 81.09); for cause or reasonable suspicion (§ 81.11); missing substances (§ 81.12); fitness for duty (§ 81.13); promotion and transfer (§ 81.14); and return to duty (§ 81.15).

The Board revised the Employee Drug Use Prevention Policy on October 15, 2008 ("Revised Policy"), and scheduled that Revised Policy to go into effect on January 1, 2009.  (*Id.*, Pet'rs' Ex. 2.)  The portions of the Revised Policy challenged by the petitioners involve the implementation of a new random drug testing scheme.[1]  Section 81.15 of the Revised Policy institutes suspicionless random drug testing for all "safety sensitive positions" as defined by § 81.05.6.[2]  Section 81.05.6 states that "safety sensitive positions" are those which "involve the care and supervision of students or where a single mistake by such employee can create an immediate threat of serious harm to students, to him or herself or to fellow employees."  That section contains a non-exhaustive list of forty-seven "safety sensitive positions" ranging from administrative assistant to cabinetmaker to coach to handyman to plumber to teacher to the superintendent.[3]  Kanawha County Schools issued

---

[1]  The Board made other changes in the Revised Policy that are not at issue here, namely, the removal of promotion and transfer testing and the addition of post-accident testing.

[2]  Section 81.15 states: "All individuals who are employed in Safety Sensitive Positions are subject to random testing for substances.  Where random testing is prohibited or restricted by applicable federal, state or local statute or regulation, Kanawha County Schools will conform to all applicable laws and regulations notwithstanding the provisions of this policy."

[3]  Section 81.05.06 in its entirety states: "The Kanawha County Board of Education has
(continued...)

[3](...continued)

several positions which are considered safety sensitive.  In general, these are positions which involve the care or supervision of students or where a single mistake by such employee can create an immediate threat of serious harm to students, to him or herself or to fellow employees.  Safety positions shall include, but not be limited to, the following positions:

81.05.6.1 Superintendent
81.05.6.2 Deputy Superintendent
81.05.6.3 Assistant Superintendent
81.05.6.4 Administrative Assistant
81.05.6.5 Director of Safety
81.05.6.6 Director of Maintenance
81.05.6.7 Principal and Assistant Principal.
81.05.6.8 Counselor.
81.05.6.9 Teacher.
81.05.6.10 Coach
81.05.6.11 Aide, including Autism Mentor, Braille and Sign Language Specialist and Paraprofessional.
81.05.6.12 Bus Operator.
81.05.6.13 Cabinetmaker.
81.05.6.14 Carpenter.
81.05.6.15 Chief Mechanic.
81.05.6.16 Child Care Worker, i.e., day-care, third base or on-deck worker
81.05.6.17 Cook and Cafeteria Manager.
81.05.6.18 Crew Leader.
81.05.6.19 Custodian.
81.05.6.20 Electrician.
81.05.6.21 Electronic Technician.
81.05.6.22 Foreman.
81.05.6.23 General Maintenance.
81.05.6.24 Glazier.
81.05.6.25 Groundsman.
81.05.6.26 Handyman.
81.05.6.27 Heating and Air Conditioning Mechanic.
81.05.6.28 Heavy Equipment Operator.
81.05.6.29 Locksmith.
81.05.6.30 Lubrication Man.
81.05.6.31 Machinist.
81.05.6.32 Mason.
81.05.6.33 Mechanic and Mechanic Assistant.
81.05.6.34 Painter.

(continued...)

-3-

a Policy Statement regarding the suspicionless random drug testing program, explaining that "[t]he job functions associated with these [safety sensitive] positions directly and immediately relate to public health and safety, the protection of life and property security.  These positions are identified for random testing because they require the highest degree of trust and confidence." (*Id.*, Pet'rs' Ex. 3.)

Petitioners American Federation of Teachers-West Virginia, AFL-CIO ("AFT"), Judy Hale, president of AFT, and Frederick Albert, Cynthia Phillips and Gregory Dodd, who are all teachers in Kanawha County Schools and members of AFT, filed a Verified Petition for Writ of Mandamus, Declaratory Judgment, and Injunctive Relief in the Circuit Court of Kanawha County, West Virginia on November 26, 2008.  They claim that the Revised Policy's random drug testing provisions violate the Fourth Amendment, Article III, § 6 of the West Virginia Constitution, and the right to privacy as it is recognized in West Virginia [Docket 1, Ex. 1].  They also filed a Motion for a Preliminary Injunction in Circuit Court, and a hearing on that motion was scheduled.  (*Id.*)  Before the state court

---

[3](...continued)
81.05.6.35 Plumber.
81.05.6.36 Printing Operator and Supervisor.
81.05.6.37 Roofing/Sheeting Metal mechanic.
81.05.6.38 School Bus Supervisor.
81.05.6.39 Supervisor of Maintenance.
81.05.6.40 Supervisor of Transportation.
81.05.6.41 Truck Driver.
81.05.6.42 Warehouse Clerk.
81.05.6.43 Welder.
81.05.6.44 Anyone who operates a county-owned vehicle.
81.05.6.45 Anyone whose job duties include administering medicine to students.
81.05.6.46 Anyone who drives his or her own vehicle on school business more than an
                average of 10 miles per week.
81.05.6.47 Any other person who volunteers to be subject to this policy.

-4-

hearing could take place, however, the case was removed to this court by the Respondents, Kanawha County Board of Education, Kanawha County Schools and Superintendent Ronald Duerring, on the grounds that this court possessed federal question jurisdiction over the case [Docket 1].  The petitioners then filed a Motion for Preliminary Injunction [Docket 3, 8] and a Motion for Waiver of Injunction Bond or for setting Bond at Nominal Amount [Docket 5] with this court.  I scheduled a motions hearing for December 29, 2008 [Docket 9].

On December 17, 2008, the West Virginia Education Association and Dale Lee, its President (collectively "WVEA"), moved to intervene as petitioners pursuant to Federal Rule of Civil Procedure 24(b)(1)(B), a motion that it also had filed in state court prior to the case's removal [Docket 10].  WVEA additionally filed its own Motion for Preliminary Injunction [Docket 12] and moved to join in the Motion for Waiver of Injunction Bond or for setting Bond at Nominal Amount [Docket 16].  I granted WVEA's Motion to Intervene on December 19, 2008, and held its other motions in abeyance to be addressed at the December 29 motions hearing [Docket 17].[4]

The respondents filed their responses to the pending motions on December 22, 2008.  They opposed the Motion for Preliminary Injunction [Docket 18], but did not object to my setting a nominal bond amount should such an injunction issue [Docket 19].  The respondents also filed their Answer to the Verified Petition on December 24, 2008 [Docket 20].

---

[4] Hereinafter, I will refer to Petitioners AFT, Judy Hale, Frederick Albert, Cynthia Phillips and Gregory Dodd and to Petitioners-Intervenors WVEA collectively as "petitioners" for ease of reference.

I held the motions hearing on December 29, 2008.[5]  I heard evidence and argument from both parties, including testimony from Petitioner Frederick Albert, a middle school teacher and the local president of AFT, and Respondent Dr. Ronald Duerring, Superintendent of Kanawha County Schools.  Mr. Albert is a sixth grade math teacher and nineteen-year veteran teacher in Kanawha County who has taught in seven schools and visited approximately half of the schools in the district as part of his work for AFT.  He testified that he has never witnessed a school employee come to school while impaired by drugs or alcohol.  (Hr'g Tr. 12/29/08 at 17.)  Mr. Albert further testified that, if he were to observe a teacher who seemed to be impaired, he would report it to the administration and that such reporting also was the policy of AFT.  (*Id.* at 17-18.)

Mr. Albert described his interaction with others on an ordinary work day, which begins with his administrator greeting staff and students on the sidewalk as they enter the school building.  (*Id.* at 18.)  Mr. Albert then greets other employees in the lobby of the school and reports to the assistant principal's office where teachers are required to sign in each morning.  (*Id.*)  Although he may spend, in the aggregate, up to five or six hours alone with students in a classroom throughout the day, Mr. Albert interacts with staff and other teachers in the teachers' lounge, the hallways where teachers are hall monitors, and in team teacher meetings.  (*Id.* at 18-19, 23.)  His administrator also visits his classroom on a daily basis.  (*Id.* at 24.)  Further, he stated, his school has cameras in the hallways, and policemen who are regularly in the building, sometimes accompanied by drug dogs.

---

[5]  At the beginning of the motions hearing, I asked the parties whether they wished to advance the trial on the merits and consolidate it with the hearing pursuant to Federal Rule of Civil Procedure 65(a)(2).  Upon request of both parties, who expressed their desire to conduct discovery, and in particular to depose teacher representatives about their safety sensitive responsibilities, I did not advance the trial on the merits and proceeded only with the preliminary injunction hearing. (Hr'g Tr. 4-10, 12/29/08.)

(*Id.* at 19-20.)  There also is a keyless entry ID system that will soon be in place at the school and will track the comings and goings of teachers.  (*Id.* at 20, 26-27.)  Mr. Albert opined that it would be very unlikely that a teacher's impairment due to drugs would go unnoticed.  (*Id.* at 19.)

In response to cross-examination, Mr. Albert stated that he had broken up a fight between elementary school students, helped students leave the school for a fire drill, and that the safety of students and his co-workers was one of his primary responsibilities.  (*Id.* at 18, 25, 27-29.)  His school conducts fire drills and shelter in place drills, where he, as well as the entire staff, is responsible for student compliance with the drills.  (*Id.* at 24-25.)  He is aware of the school district policies on teacher duties and that teachers in West Virginia act *in loco parentis* to the students.  (*Id.* at 25-26.)  Mr. Albert stated that "we want all students to be learning in a safe environment. . . . We want our teachers to be teaching in safe buildings."  (*Id.* at 27.)  He stated that he is proud of his union's efforts to provide a safe learning environment for students and employees.  (*Id.*)

Finally, Mr. Albert opined that the new random drug testing policy "is very unnecessary. It's intrusive.  It is an affront to our profession.  It's demeaning.  It's demoralizing.  It's an unnecessary expense.  We need those resources in the classroom."  (*Id*. at 17.)

Superintendent Dr. Duerring, who has been an employee of Kanawha County Schools for thirty-four years as a teacher, principal, assistant superintendent and superintendent, testified for the respondents as to his role in formulating the Revised Policy, which he stated the Board considered for approximately two years and made available for public comment before its passage.  (*Id.* at 30-31.)  He testified that drug testing has been in place in the Kanawha County school system since 1994, when the district began randomly drug testing bus drivers pursuant to federal Department of Transportation regulations.  (*Id.* at 31.)  Suspicion-based testing for other employees was instituted

by the Board at the beginning of 2008, and Dr. Duerring declared that, to his knowledge, anywhere from six to nine employees have tested positive for illegal drug use under that suspicion-based testing program during its first year.  (*Id.* at 32, 41-42, 52.)  Without giving many specifics, he discussed a few instances of employee substance abuse, including a teacher who would arrive at school still inebriated from the weekend and whose students noticed his or her impairment.  (*Id.* at 38.)  He also relayed a recent incident in which a teacher would fall asleep at his or her desk due to impairment from medication and also would not follow the curriculum.  (*Id.* at 39.)  Dr. Duerring admitted that the latter incident involved no injury to person or property, but rather was a failure to teach.  (*Id.* at 39-40.)

Dr. Duerring testified that the Board formulated the suspicionless random drug testing policy in reaction to the six to nine employees who tested positive under the suspicion-based testing program and the case of a Kanawha County principal who in 2006 was charged with possession of cocaine at an area mall.  (*Id.* at 46-47, 51-52.)  Though that case was widely publicized, the principal was later acquitted of the charges and reinstated.  (*Id.* at 47-48.)  Those incidents caused the Board to feel that drug use was becoming more prevalent among Kanawha County Schools employees.  (*Id.* at 51, 55-56.)

Additionally, Dr. Duerring stated that the Board decided to start randomly drug testing employees in safety sensitive positions out of a general prophylactic concern for student safety.  (*Id.* at 45-47, 51.)  Specifically, the Board feared that teachers in the classroom could present a danger to students.  (*Id.* at 34, 45-47, 51.)  That same fear for student safety, he testified, has led the Board to install cameras and an ID keyless entry system in the schools, to remove shrubbery outside of the buildings, and to ban pocket knives and guns.  (*Id.* at 45-46.)  According to Dr. Duerring, the

Revised Policy is "just another step in that direction of saying that there's one more step we have to go to keep children safe, to make sure they're secure in the classroom when [the teachers] have your daughter or your grandchild or your niece or nephew in there for the majority of the day behind closed doors." (*Id.* at 45-46.) The Board felt that "it was time to bring this policy into effect to make sure that the children were kept safe not only from anybody entering the building, but [from] anybody in the building." (*Id.* at 56.)

Dr. Duerring testified that teachers and the other identified positions qualified as being safety sensitive, in the Board's opinion, because employees in those positions dealt with children or were around children and because those employees made decisions that "could have an effect on children." (*Id.* at 34-35, 37, 54.) He testified that some of the employees in those positions did not have direct contact with children but worked around children or with machinery in the building because "any of those things they do within the building could have an effect on our children." (*Id.* at 53-54.) He relayed that the Board felt that "all positions dealing with children were safety-sensitive." (*Id.*)

Dr. Duerring discussed the legal obligation of teachers in West Virginia to act *in loco parentis* to students, and their roles in ensuring the safety of children during fire drills and bomb threats. (*Id.* at 35-38.) He stated that employees could not perform those roles in a safe manner if they were impaired by drugs. (*Id.* at 38.) He stated that it is the responsibility of educators to keep children safe. (*Id.* at 34, 46.)

In response to my questioning, Dr. Duerring admitted that, to his knowledge, no student in Kanawha County Schools or anywhere in the country has ever suffered an injury due to a drug or alcohol impaired teacher. (*Id.* at 38-39.) The Board did not consider any specific instances of

student injury in arriving at the Revised Policy. (*Id.* at 39, 55-56.) Dr. Duerring discussed lawsuits where teachers and the Board were sued for a failure to supervise, but could not say that any alleged failure was caused by drug impairment. (*Id.* at 44, 49.) Dr. Duerring testified that the Board did not consider any particular evidence of harm that had occurred, but believed that there was a risk that harm could occur. (*Id.* at 45, 55-56.)

In addition to the proffered testimony, the parties stipulated to the admission of the current Employee Drug Use Prevention Policy, the Revised Policy, and Policy Statement, all of which are described above. (Hr'g 12/29/08, Pet'rs' Ex. 1-3 [Docket 24].) The respondents also submitted into evidence the "Kanawha County Board of Education Policy: Duties and Responsibilities of Teachers Series C35," which describes the duties and authority of teachers in their *in loco parentis* role, and the "Kanawha County Schools Administrative Regulations: Employee Identification Badges Series G82A," which describes the employee identification badge and key card policy put in place in order "to provide a safe environment for employees, students and visitors while on the premises and in all buildings owned by Kanawha County Schools." (*Id.*, Res'ts' Ex. 1-2.)

## II. Discussion

The petitioners seek a preliminary injunction against the suspicionless random drug testing provisions of the Revised Policy.[6] Based on the evidence before me, I **FIND** that the petitioners have demonstrated that each of the *Blackwelder* factors weighs in their favor based on a violation

---

[6] The papers are somewhat unclear as to precisely what the petitioners are seeking to enjoin, that is, the entire Revised Policy or only the random drug testing provisions of that policy. Upon questioning the petitioners at the hearing, however, it became clear that they wished only to enjoin the particular random testing provisions of the Revised Policy. (Hr'g Tr. 12/29/08 at 3-4.)

of the Fourth Amendment and that a preliminary injunction should issue.  Consequently, I need not address the petitioners' arguments under West Virginia law.

### A. Preliminary Injunction Standard

The United States Court of Appeals for the Fourth Circuit has provided district courts with a precise analytical framework for determining whether to grant preliminary relief.  *See Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802 (4th Cir. 1992); *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.*, 550 F.2d 189 (4th Cir. 1977).  First, a court must determine whether the party requesting preliminary relief has made a clear showing that he will suffer irreparable harm if the court denies preliminary relief.  *Direx Israel*, 952 F.2d at 812.  Second, a court must balance the likelihood of irreparable harm to the moving party if the court denies preliminary relief against the likelihood of harm to the nonmoving party if the court grants preliminary relief.  *Id.*  Third, a court must determine whether the moving party has made a sufficient showing of a probability of success on the merits.  *Id.* at 812-13.  If the balancing of harms tips decidedly in the moving party's favor, the moving party need only raise questions going to the merits sufficiently serious, substantial, difficult, and doubtful to make them fair grounds for litigation and thus more deliberate investigation.  *Id.* at 813.  If the balancing of harms does not tip decidedly in the moving party's favor, the moving party must make a stronger showing of potential success on the merits.  *Id.*  Finally, a court must consider whether the public interest favors granting preliminary relief.  *Id.* at 814.  The party seeking the preliminary injunction must establish that each of these factors supports granting the injunction.  *Id.* at 812.

**B. Probability of Success on the Merits**

Ordinarily, the first *Blackwelder* factor that I must consider is whether the petitioners have made a clear showing that they will suffer irreparable harm if I decline to issue the injunction. *See Manning v. Hunt*, 119 F.3d 254, 263-64 (4th Cir. 1997). In this case, however, the irreparable harm the petitioners allege is inseparably linked to their claims that their Fourth Amendment right to be free from an unreasonable search will be violated. *Cf. W. Va. Ass'n of Club Owners & Fraternal Svcs., Inc. v. Musgrave*, 512 F. Supp. 2d 424, 429 (S.D. W.Va. 2007) (applying this analysis in the context of an allegation that the petitioner's First Amendment right to freedom of speech had been violated). The right to be free from unreasonable searches is a fundamental constitutional right, the violation of which is sufficient to demonstrate irreparable harm. *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *see also Campbell v. Miller*, 373 F.3d 834, 839 (7th Cir. 2004) (Williams, J. dissenting) (quoting *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984)); *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960). Accordingly, to properly address the petitioners' claim of irreparable injury, I must first determine their likelihood of success on the merits. *Cf. Giovani Garandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002); *Musgrave*, 512 F. Supp. 2d at 429.

The Board's drug testing policy must conform with the requirements of the Fourth Amendment because drug testing is a search and the Board is a state entity. The Fourth Amendment to the United States Constitution restrains governmental conduct and "requires the government to respect '[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures.'" *Chandler v. Miller*, 520 U.S. 305, 308 (1997) (quoting U.S. Const. amend. IV). *Private employers* are free to search their employees because the Fourth Amendment "does not apply to

-12-

searches by private parties, absent governmental involvement." *United States v. Humphrey*, 208 F.3d 1190, 1203 (10th Cir. 2000); *see also Ritchie v. Walker Mfg. Co.*, 963 F.2d 1119, 1121 (8th Cir. 1992). The Kanawha County School Board, however, is an arm of the government, and as such may not conduct unreasonable searches of its employees in violation of the Fourth Amendment. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (categorizing boards of education as state actors).

It is well-established that urinalysis drug testing, conducted by state actors, qualifies as a search subject to the Fourth Amendment's protections. *Skinner v. Ry. Labor Exec. Ass'n et al.*, 489 U.S. 602, 614-17 (1989) (finding that government-ordered "collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable"); *United Teachers of New Orleans v. Orleans Parish Sch. Bd.*, 142 F.3d 853, 856 (5th Cir. 1998). Not only does drug testing qualify as a search, but it is a particularly invasive one because drug testing, especially by urinalysis, intimately involves an individual's privacy and bodily integrity. "There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom." *Skinner*, 489 U.S. at 617 (internal quotation marks omitted).

Ordinarily, when an arm of the state conducts a search there must be some "individualized suspicion of wrongdoing" to satisfy the Fourth Amendment's prohibition of unreasonable searches. *Chandler*, 520 U.S. at 308, 313-14. Searches conducted without grounds for suspicion towards particular individuals may pass constitutional muster, however, when conducted for "special needs, beyond the normal need for law enforcement." *Skinner*, 489 U.S. at 619. "When such 'special

needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler*, 520 U.S. at 314 (citing *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665-66, 668 (1989)). "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner*, 489 U.S. at 624. I cannot overemphasize how limited these circumstances are—a suspicionless search may be conducted only if it falls within the "closely guarded category" of special needs. *Chandler*, 520 U.S. at 309.

To determine whether a special need exists that justifies a suspicionless search, a court must ask whether there is a safety concern that is substantial enough to override the individual's privacy interest and to suppress the Fourth Amendment's requirement of individualized suspicion. *See Chandler*, 520 U.S. at 318, 323; *Von Raab*, 489 U.S. at 668-671, 674; *Skinner*, 489 U.S. at 608-34. The requisite weight of the safety interest is apparent from an examination of the Supreme Court precedents on point: *Skinner v. Railway Labor Executives' Association*, *National Treasury Employees Union v. Von Raab*, *Chandler v. Miller*, *Vernonia School District 47J v. Acton*, and *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls*.[7]

*Skinner v. Railway Labor Executives' Association* involved federal railroad employees who, as a group, had a history of drug or alcohol use and were required by federal regulation to undergo

---

[7] I note that neither the Supreme Court nor the Fourth Circuit has ruled upon the constitutionality of a suspicionless random drug testing program for public school teachers or other public school personnel.

-14-

blood and urine tests after a train accident.  489 U.S. at 608-12.  In concluding that suspicionless

drug testing was constitutional in that case, the Supreme Court balanced the implicated privacy

interest against the government interest in testing.  *Id.* at 619, 622-33.  The Court found that the

evident privacy concerns raised by the tests were offset by the regulations, which minimized the

intrusiveness of the tests, and by the fact that railroad employees had a reduced expectation of

privacy by virtue of their employment "in an industry that is regulated pervasively to ensure safety."

*Id.* at 626-27.  The *Skinner* Court further concluded that, on the other side of the balancing test,

"surpassing safety interests" justified the drug tests because railroad employees were uniquely

positioned to "cause great human loss before any signs of impairment became noticeable to

supervisors."  *Id.* at 628.  Those employees were charged with duties so "fraught with such risks of

injury to others that even a momentary lapse of attention [could] have disastrous consequences."

*Id.*  The *Skinner* Court further reasoned that a suspicion-based testing regime would not be

practicable because employees were not regularly observed in their work, an accident would not

single out a particular employee, and imposing a requirement of individualized suspicion would

impede the employer's ability to determine the cause of a chaotic train accident.  *Id.* at 628-31.

In *National Treasury Employees Union v. Von Raab*, the Court upheld drug testing as a

condition of promotion or transfer of United States Customs Service agents to positions directly

involving drug interdiction or  requiring the employee to carry a firearm.  489 U.S. at 660-61.

Although there was no demonstrated drug abuse problem among those employees, the Court held

that the government had a compelling safety interest in assuring that customs employees were not

drug users because those employees formed the country's "first line of defense against one of the

greatest problems affecting the health and welfare of our population."  *Id.* at 668.  As the Court

explained, "[t]his national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics." *Id.* at 670. The *Von Raab* Court also perceived a safety risk inherent in the positions performed by employees who carried firearms because those employees could use deadly force for which a momentary lapse of attention could have disastrous consequences. *Id.* at 670-71 ("[T]he public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force.").

The Court balanced the government's concerns for national security and safety against the Customs employees' diminished expectations of privacy.

> [E]mployees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms. Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness.

*Id.* at 672. The Court further observed that it would not be feasible to subject these employees to day-to-day supervision and scrutiny of the type possible in more traditional office environments. *Id.* at 674. The Court therefore concluded that the privacy expectations of those employees did not outweigh the government's interest in the "extraordinary safety and national security hazards" implicated by their profession. *Id.* at 672, 674.

*Chandler v. Miller* involved a Georgia statute that required candidates for certain state offices to certify that they had taken a drug test and that the test result was negative. 520 U.S. at 308. The Court found that, although the testing method was relatively noninvasive, the government failed to show a sufficiently substantial and important special need to legitimize the suspicionless search. *Id.* at 318. The respondents in *Chandler* justified the testing based on the incompatibility

-16-

of illegal drug use with public office because such illegal drug use calls into question an official's judgment and integrity, jeopardizes the completion of public functions, including anti-drug efforts, and undermines public confidence and trust in elected officials.  *Id.*  The Court found that the respondents had not shown "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule" requiring individualized suspicion.  *Id.* at 318-19.  Because "[n]othing in the record hint[ed] that the hazards . . . [were] real and not simply hypothetical," there was no indication that Georgia had an actual problem with drug use by state officials.  *Id.* at 319. Although a demonstrated problem of drug abuse was not essential to the validity of a drug testing program, it "would shore up an assertion of special need for a suspicionless general search program. Proof of unlawful drug use may help to clarify—and to substantiate—the precise hazards posed by such use."  *Id.*  Additionally, the Court found it significant that candidates for public office were not unsupervised like the employees in *Skinner* and *Von Raab*, for whom lack of supervision tended to render a suspicion-based testing program impracticable.  Instead, the *Chandler* Court found that public officials "are subject to relentless scrutiny—by their peers, the public and the press.  Their day-to-day conduct attracts attention notably beyond the norm in ordinary work environments."  *Id.* at 321.  The Court found that Georgia was concerned only with image and was not attempting to combat a demonstrated drug problem or safeguard others from harm while the officials performed high-risk, safety-sensitive tasks.  *Id.* at 321-22.  Instead, "the need revealed . . . is symbolic, not 'special,' as that term draws meaning from our case law."  *Id.* at 322.  The *Chandler* Court concluded that "where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."  *Id.* at 323.

The Supreme Court also has applied this balancing test to the suspicionless drug testing of students, and found that the balance of privacy interests versus the government's special need tips strongly in favor of the existence of a special need justifying the testing program. *See generally Bd. of Ed. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822 (2002); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995). *Vernonia* involved the suspicionless drug testing of student athletes in a school where those athletes were the leaders of a growing drug culture. 515 U.S. at 649-50. The Court first found that students had a reduced privacy interest by virtue of their being under the control of the school and that athletes in particular had a reduced privacy interest due to the element of communal undress in showers and locker rooms and the increased regulations to which they were subject compared to the general student body. *Id.* at 654. This reduced privacy interest was outweighed, the *Vernonia* Court concluded, by the government's special interest in preventing the particular harm children could do to their own bodies by using illegal drugs at a young age as well as the harm that an athlete on drugs could cause to others on the playing field. *Id*. at 654, 661-62.

Similarly, in *Earls*, the Court was asked to determine the constitutionality of a school district requirement that all middle and high school students who wished to participate in extra-curricular activities first consent to drug testing. Those students also had to agree to submit to random drug testing while participating in their chosen activity and to be tested at any time upon reasonable suspicion. 536 U.S. at 826. The *Earls* Court emphasized that the *Vernonia* decision "depended primarily upon the school's custodial responsibility and authority," and concluded that students who participate in extra-curricular activities are subject to many of the same privacy intrusions as athletes, including occasional off-campus travel and communal undress, and that they are also

subject to a higher degree of regulation than other students.  *Id.* at 831-32.  In light of the evidence of specific drug use at the relevant schools, and the general "need to prevent and deter the substantial harm of childhood drug use," the *Earls* court upheld the drug testing policy, finding that "the safety interest furthered by drug testing is undoubtedly substantial for all children, athletes and non-athletes alike.  We know all too well that drug use caries a variety of health risks for children, including death from overdose."  *Id*. at 834-37.

Suspicionless drug testing in all of those cases was justified by varying types of special needs, but the requirement that there be a safety concern of sufficient magnitude to outweigh the particular privacy interests involved is a common thread that ties them together and which guides my determination in this case.  The Supreme Court has found thus far sufficiently important special needs to outweigh an individual's privacy interests when faced with major safety concerns such as the great harm to people and property that could result from a railroad accident, the threat to national security posed by the failed interdiction of illegal drugs smuggled across our borders, and the risk to safety created by the potential use of deadly force by a drug-addled Customs employee equipped with a firearm.[8]  The Supreme Court has also found that a lesser safety concern can qualify as a

---

[8]   The vast majority of lower courts have required extraordinary safety interests of comparable magnitude to *Skinner* and *Von Raab* to justify the suspicionless random drug testing of public employees.  *See, e.g., Wilcher v. City of Wilmington*, 139 F.3d 366, 375 (3d Cir. 1998) (approving drug testing program for firefighters in part because "[a] firefighter with a drug problem poses as great a threat to public safety as does a customs official or rail operator.  A firefighter whose drug use is undetected is a source of danger both to his colleagues and to the community at large.  In addition, the firefighter puts himself at great risk of harm."); *Int'l Bhd. of Elec. Workers, Local 1425 v. U.S. Nuclear Regulatory Comm'n*, 966 F.2d 521, 525-27 (9th Cir. 1992) (upholding drug testing of those nuclear power plant workers who engage in "undeniably safety-sensitive work"); *Int'l Bhd. of Teamsters, Chauffeurs, W. Conference of Teamsters v. Dep't of Transp.*, 932 F.2d 1292, 1303-04 (9th Cir. 1991) (finding that the government had a compelling concern for safety in the drug testing of commercial truck drivers because "[g]iven the enormous size of commercial
(continued...)

special need, but only when the persons to be tested possess a greatly diminished privacy interest.[9]

_____

[8](...continued)

trucks, relative to other vehicles on the road, a single mistake in judgment or momentary lapse in attention can have devastating consequences for other travelers.  This is especially true for drivers who carry hazardous cargo."); *Taylor v. O'Grady*, 888 F.2d 1189, 1196-97 (7th Cir. 1989) (finding that, for correctional employees who come into contact with potentially violent prisoners in a large jail "fraught with serious security problems," "[d]rug impairment by a guard, who may very well be armed, carries rather extreme and immediate dangers" and that "[o]ther prisoners, visitors, correctional officers, and the public are all put at risk by the presence of drugs in a jail" (quotation and quotation marks omitted)); *Nat'l Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 610-15 (D.C. Cir. 1989), *cert. denied* 493 U.S. 1056 (1990) (finding that the Army has a compelling safety interest in randomly drug testing its civilian employees who fly and service its airplanes and helicopters, who are civilian police and guards, and who are involved in drug interdiction); *Thomson v. Marsh*, 884 F.2d 113, 115 (4th Cir. 1989) (upholding random drug tests on civilian employees at a chemical weapons plant in part where the employees worked with "extremely lethal" chemical agents for which "a momentary lapse of attention can have disastrous consequences," such as killing everyone within a few feet and injuring everyone within a few yards if merely a small amount were released (quoting *Skinner*, 489 U.S. at 628) (quotation marks omitted)); *Rushton v. Neb. Pub. Power Dist.*, 844 F.2d 562, 566-67 (8th Cir. 1988) (finding drug testing of nuclear power plant operators constitutional in part because the potential for harm was "vast").

[9]  The safety interests asserted by the government in *Vernonia* and *Earls* were of lesser magnitude than those at stake in *Skinner* and *Von Raab*.  In the student drug testing cases, the safety interest arose from the state's special relationship to school children.  "[T]he necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction."  *Vernonia*, 515 U.S. at 662.  The Court found that drug use by children causes particular harm to them because they experience the physical, psychological and addictive effects of drugs more severely than do adults.  *See id.* at 661-62.  Children also may die from a drug overdose.  *Earls*, 536 U.S. at 836-37.  The harm to individual children who consume illegal drugs, although admittedly serious, does not rise to the magnitude of a catastrophic train accident which kills or injures many people and destroys costly property, or of the threat to national security by the admission of drugs into the country.

The Court found that the safety interests nevertheless were sufficient to justify the suspicionless drug testing of students because they were balanced against a drastically reduced privacy interest and so were sufficient to tip the scale in favor of the government's special need.  The privacy interests of student athletes and participants in extra-curricular activities are greatly diminished in ways that the privacy interests of teachers and other school employees are not.  Minor children are subject to the control of their parents or guardians and to the control of teachers and administrators when they are in school and those state actors are responsible for maintaining discipline, health, and safety.  *See id.* at 830; *Vernonia*, 515 U.S. at 654-55.  Children also must undergo physical examinations and vaccinations to attend school.  *Vernonia*, 515 U.S. at 656.

(continued...)

*See Earls*, 536 U.S. at 830-32, 836-37; *Vernonia*, 515 U.S. at 654-56, 661-62.  Viewed as a whole, these precedents plainly reveal that the special needs exception to a suspicion-based search was intended to be a very narrow one and to apply only when the government is faced with a safety concern of sufficiently great magnitude to outweigh the privacy interests of the group to be searched.

Furthermore, to justify a suspicionless search, the Supreme Court tells us that the danger to the identified safety interest must also be *concrete.  See Chandler*, 520 U.S. at 319.  "Concrete" is defined by Webster's New International Dictionary as "characterized by immediate experience of realities" and as "belonging to or standing for actual things or events."  *Webster's New Int'l Dictionary* (2002).  A concrete danger must be an actual, threatened danger and not some perceived potential danger.  To justify such a suspicionless search, I must not engage in a speculative exercise to find remote risks of horrible disasters.  Rather, I should examine the normal course of a particular employee's duties to determine if there are concrete dangers inherent in those duties that are significant enough to override an individual's privacy interest.  In other words, the proper focus is the constant level of risk which adheres to and permeates the position on an everyday basis.  *See* Note, Zachary A. Bulthis, "Suspicionless Drug Testing By Public Actors: How *Chandler v. Miller* Should Change the Standard," 74 S. Cal. L. Rev. 1549, 1559 (2001); *see also* Karin Schmidt, "Suspicionless Drug Urinalysis of Public School Teachers: The Concern For Student Safety Cannot

---

[9](...continued)
Student athletes have even more of a reduced privacy expectation because they must change and shower in a public manner and are more highly regulated than the general student population.  *Id.* at 657.  Similarly, in the Supreme Court's view, students who participate in extra-curricular activities travel off campus, sometimes undress in a communal atmosphere, and are subject to greater rules and requirements that other students do not face.  *Earls*, 536 U.S. at 831-32.  Therefore, *Vernonia* and *Earls* show that a lesser safety concern can qualify as a special need but *only* when outweighed by a greatly diminished privacy interest.

Outweigh Teachers' Legitimate Privacy Interests," 34 Colum. J. L. & Soc. Probs. 253, 274-77 (2001).  In conducting that inquiry, I must ask whether the evidence demonstrates that the purported risks and safety interests are those that are actual and immediate, or whether they are abstract and removed.

Accordingly, I will conduct a balancing test to determine whether, in conducting random drug testing of Kanawha County Schools employees, it would be "impractical to require a warrant or some level of individualized suspicion . . . ."  *Von Raab*, 489 U.S. at 665-66; *see also, e.g., Skinner*, 489 U.S. at 619, 626-27; *Rushton v. Neb. Pub. Power Dist.*, 844 F.2d 562, 566 (8th Cir. 1988).  I must first consider the level of intrusiveness posed by the particular testing procedures and whether the teachers and other employees have a reduced expectation of privacy by virtue of their employment.  Secondly, I must assess the government's interest in the special need.  In this particular case, the respondents claim that the suspicionless random drug testing policy addresses a special need because those employees occupy "safety sensitive positions" akin to those occupied by the railroad workers in *Skinner*.  Indeed, many courts have found that the safety concerns associated with persons employed in safety sensitive positions are large enough to override the privacy interests of those persons and justify suspicionless drug testing because safety sensitive positions are those in which the ordinary course of their job performance carries a concrete risk of massive property damage, personal injury, or death.  *See Chandler*, 520 U.S. at 319; *Von Raab*, 489 U.S. at 660, 669-71; *Skinner*, 489 U.S. at 628; *see also, e.g., Wilcher v. City of Wilmington*, 139 F.3d 366, 375 (3d Cir. 1998); *Thomson v. Marsh*, 884 F.2d 113, 115 (4th Cir. 1989).  To assess the weight of the special need asserted by the government, I will also consider whether the relevant positions are those in which observation would not detect the impairment, and if there is a demonstrated

-22-

pervasive drug problem among employees in those positions.  *See Chandler*, 520 U.S. at 319, 321;

*Von Raab*, 489 U.S. at 674; *Skinner*, 498 U.S. at 606-07, 629-31.

In conducting this balancing inquiry, I will examine each of the positions the Kanawha

County Schools have deemed safety sensitive.  *See* footnote 3 of this opinion.  At the hearing, and

in their submissions to the court, the respondents concentrated on teachers to the practical exclusion

of all other employees categorized as safety sensitive.  To justify suspicionless random drug testing

of those employees, however, the respondents must demonstrate that the government's interest in

the special need outweighs the individual's privacy interest *for each of these positions*.  *See Von*

*Raab*, 489 U.S. at 677-78; s*ee also, e.g., Taylor v. O'Grady*, 888 F.2d 1189, 1197 (7th Cir. 1989)

(holding that the category of employees to be tested must directly encompass those employees

indicated by the governmental interest, and must not be overly broad); *Nat'l Fed'n of Fed.*

*Employees v. Cheney*, 884 F.2d 603, 611, 614-15 (D.C. Cir. 1989), *cert. denied* 493 U.S. 1056

(1990) (although the Army has a compelling safety interest in randomly drug testing those

employees who fly and service airplanes and helicopters, who are civilian police and guards, and

who are involved in drug interdiction, holding that the drug testing of other employees was not

reasonable because the court had not been shown that the governmental interests in testing those

employees outweighed their privacy expectations).

Finally, I clarify the relevant burdens of proof.  In seeking a preliminary injunction, the

petitioners must demonstrate that each of the *Blackwelder* factors weighs in their favor, including

a demonstration that the petitioners will likely succeed on the merits.  *Direx Israel*, 952 F.2d at 812-

13.  When I consider the case on the merits, the burden shifts to the respondents to show a special

need of sufficient magnitude to override the individuals' privacy interest.  *See Chandler*, 520 U.S.

at 318-19.  The petitioners therefore must demonstrate that, on the merits, the respondents could not show such a special need.

### 1. The Employees' Privacy Interests

In considering the nature of the privacy interests at stake, I will examine the intrusiveness of the proposed drug test and whether the employees targeted for random drug testing in this case have a reduced expectation of privacy by virtue of their employment.

I begin with the character of the government's search and the extent to which it intrudes on the employee's privacy.  The Supreme Court has considered "the manner in which production of the urine sample is monitored" in evaluating the degree of the search's intrusiveness.  *Skinner* 489 U.S. at 626.  Direct observation during urinalysis collection procedures "represents a significant intrusion on the privacy of any government employee."  *Wilcher*, 139 F.3d at 376 (drug testing procedure involved monitored collection process for all submissions).  Drug testing may also be unduly intrusive due to its potential to disclose private information concerning the state of the subject's body or materials that he or she has ingested (that is, whether the person is pregnant, epileptic, diabetic, etc.).  *See Skinner*, 489 U.S. at 617.

The Policy Statement describes the administration of the suspicionless random drug testing program.  The testing will be conducted by Health Research Systems/EMSI, who will collect specimens from employees at their work site and test those samples at a certified laboratory.  (Hr'g 12/29/08, Pet'rs' Ex. 3.)  The results will be transmitted to a certified Medical Review Officer who will provide the final results determination.  (*Id.*)  Testing for illegal drugs, which will be targeted for use of amphetamines, methadone, phencyclidine, cocaine, opiates, marijuana (THC), barbiturates, and benzodiazepines, will be conducted by urinalysis, and testing for alcohol will be

-24-

conducted by breath analysis.  (*Id.*)  "To ensure [the] privacy and dignity of employees, random collections will not be 'observed' unless [the] collector has reason to believe the donor has or will attempt to substitute or adulterate a sample.  Standard collection procedures will be used to ensure the integrity of the test."[10]  (*Id.*)  Further, "[a]ll reasonable steps will be taken to assure the dignity of the employee and confidentiality of information."  (*Id.*)  A unique sample identification number is assigned to each donor and used to identify the sample throughout the process, which has an established chain of custody procedure.  (*Id.*)  There is also a split sample testing process, which is used at the option of the employee to verify a positive test result.  (*Id.*)

The Administrative Assistant of Human Resources will implement the program of random testing and will

> evaluate periodically whether the numbers of employees tested and the frequency with which those tests will be administered satisfy Kanawha County Schools' duty to achieve a drug-free work force and [m]onitor the number of sensitive employees occupying testing designated positions and the frequency with which random tests will be conducted.

(*Id.*)  Using a random algorithm, the Policy Statement indicates that 25% of the pool of 3,326 employees deemed to be safety sensitive will be tested (that is, 832 employees over nine months at

---

[10]   The respondents have submitted an affidavit by Kenneth Schneider, the Operations Manager for Health Research Systems, Inc. d/b/a EMSI.  (Response, Ex. 4 [Docket 18].)  Mr. Schneider states: "The vast majority of specimen collections are unobserved.  The [Medical Review Officer] may treat a suspicious collection as a 'refusal to test' or order a second, observed collection. In [his] experience, only about ten out of every 5000 or 6000 collection attempts results in an observed collection."  (*Id.* ¶ 10.)

He also states that Medical Review Officers "are trained and observe strict standards of confidentiality.  Those standards require that medical information disclosed to the [Medical Review Officer] during the test result verification process is not to be provided to any third party, including the employer, without the employee's express written consent."  (*Id.* ¶ 9.)

a rate of ninety-two tests per month).  (*Id.*)  The estimated annual cost of this program at a rate of

$44 per test is $36,608.  (*Id.*)

When an employee is selected for random testing, that employee and the individual's first-

line supervisor will be notified the same day that the test is scheduled.  (*Id.*)  "The supervisor shall

explain to the employee that the employee is under no suspicion of taking drugs and that the

employee's name was selected randomly."  (*Id.*)  The Medical Review Officer will notify Human

Resources of all negative tests within forty-eight hours and positive test results will be

communicated to Human Resources as soon as confirmation results are available.  (*Id.*)  In the case

of a positive test result, the Medical Review Officer first contacts the employee "to ascertain

whether there is an acceptable medical reason for the positive result."  (Aff. Kenneth Schneider,

Response, Ex. 4 ¶ 7 [Docket 18].)  If such a reason is not provided, the Medical Review Officer

gives him or her the opportunity to have the split specimen tested at a second laboratory.  (*Id.* ¶ 8.)

Human Resources will maintain the records of all test results.  (Hr'g 12/29/08, Pet'rs' Ex. 3.)

"Where possible, in addition to appropriate personal [sic] action, an employee will be referred to

rehabilitation with a self-admitted or detected drug or alcohol problem." (*Id.*)  The Revised Policy

does not indicate what action will be taken against an employee who refuses to take a random drug

test or who tests positive in a random drug testing.[11]  (*Id.*)

On the record before me, I **FIND** that the proposed drug testing collection process is not an

overly intrusive drug testing procedure.  *See Chandler*, 520 U.S. at 326 (Rehnquist, J., dissenting);

---

[11] The Policy's other testing provisions, that is, for cause, post-accident, missing substances, fitness for duty and return to duty testing do provide for those contingencies.  Generally, the Policy provides (with some slight variation by provision) that a refusal to submit to such testing is grounds for termination of employment and that a positive test also constitutes grounds for termination.

*Von Raab*, 489 U.S. at 672 n.2.  The vast majority of the collections will not be monitored; only approximately ten out of every 5000 or 6000 collection attempts will be monitored. The Medical Review Officer is charged with keeping any medical information disclosed to him or her private from all third parties, including the employer.  Testing is only performed for the presence of amphetamines, methadone, phencyclidine, cocaine, opiates, marijuana (THC), barbiturates, and benzodiazepines.

Secondly, I must consider whether any of these employees have a reduced privacy interest. Public employees may have a reduced expectation of privacy by virtue of their employment if that employment carries with it safety concerns for which the employees are heavily regulated.  *See Skinner*, 489 U.S. 626-27; *see also, e.g., Wilcher*, 139 F.3d at 374; *Int'l Bhd. of Teamsters*, 932 F.2d at 1300-02; *Cheney*, 884 F.2d at 613.  By way of illustration, nuclear power plant operators are heavily regulated for safety, as are chemical weapons plant employees.  *See Thomson*, 884 F.2d at 115; *Rushton*, 844 F.2d at 563-64, 566.  The safety regulations imposed on nuclear power plant operators include carefully controlled access to nuclear power plants, observation of people while they are working or moving around the plant, regular visits by safety inspectors, and regulation by the Nuclear Regulatory Commission, which requires that plants have an employee drug testing plan. *Rushton*, 844 F.2d at 563-64, 566.  Chemical weapons plant employees similarly are required to take annual physicals, which include blood and urine tests, and to undergo extensive background checks to receive clearance.  Further, "the nature of their responsibilities is such that . . . [they cannot] justifiably expect to keep from their superiors personal information regarding the use of illegal drugs." *Thomson*, 884 F.2d at 115.

The respondents argue that teachers (but no other school district employee) are part of a profession that is heavily regulated for safety, but they have offered scant evidence to support that assertion.  The only evidence on the record that relates to the regulation of teachers is Respondents' Exhibits 1 and 2 from the hearing.  Specifically, Exhibit 1 consists of the Kanawha County Board of Education Policy: Duties and Responsibilities of Teachers Series C35, which describes the duties and authority of teachers in their *in loco parentis* role, and Exhibit 2 is the Kanawha County Schools Administrative Regulations: Employee Identification Badges Series G82A, which describes the employee identification badge and key card policy put in place in order "to provide a safe environment for employees, students and visitors while on the premises and in all buildings owned by Kanawha County Schools."  (Hr'g 12/29/08, Res'ts' Ex. 1-2.) That evidence does not even suggest that teachers or any other of the relevant positions are heavily regulated for safety in the way that railroad workers, Customs agents, or nuclear plant operators are.  *Cf. Int'l Bhd. of Teamsters*, 932 F.2d at 1300-02; *Cheney*, 884 F.2d at 613; *Thomson*, 884 F.2d at 115; *Rushton*, 844 F.2d at 563-64, 566.

Although I question whether the respondents *could* offer evidence to show that teachers and the other employees are heavily regulated for safety, *see Aubrey v. Sch. Bd. of Lafayette Parish*, 148 F.3d 559, 570 (5th Cir. 1998) (Dennis, J. dissenting) (contending that school janitors are not pervasively regulated); *Patchogue-Medford Congress of Teachers v. Bd. of Educ.*, 119 A.D.2d 35, 38-39 (N.Y. A.D. 2 Dept. 1986), *aff'd* 510 N.E.2d 325 (N.Y. 1987) (finding that teachers are not pervasively regulated); *see also* Schmidt, *supra*, 34 Colum. J. L. & Soc. Probs. at 270 ("[T]here is a difference between such substantive regulation [of teachers] as to certification and curricular concerns prevalent in the realm of education and industries 'heavily regulated for safety' such as the

railways and United States Customs Service."),[12] I need not decide that issue today.  I **FIND** that the record does not demonstrate that any of the school teachers or other employees are heavily regulated for safety.

Finally, I **FIND** no evidence that the teachers or other school employees have a reduced privacy interest by virtue of their employment in the public school system that is comparable to the students in *Vernonia* and *Earls*.  Teachers, administrative assistants, cabinetmakers, coaches, handymen, plumbers and the like are professional adults over whom the school as employer (and *not* as parent) does not maintain a comparable degree of control.  *See* Schmidt, *supra*, 34 Colum. J. L. & Soc. Probs. at 267-68.  The state simply cannot exercise a similar degree of control over adult employees as it does over students.  *See Earls*, 536 U.S. at 831 ("Securing order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults.").

### 2. The Government's Interest in the Special Need

On the evidence before me, the respondents have not shown that the employees deemed to be "safety sensitive" by the Revised Policy in fact occupy safety sensitive positions as that term of art has been defined by the United States Supreme Court.  For an employee to occupy a truly safety sensitive position, it is not enough to show that the employee has *some* interest or role in safety.  Rather, the government must demonstrate that the employee's position is one that in the ordinary course of its job performance carries a concrete risk of massive property damage, personal injury

---

[12] *But see Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 379, 382-84 (6th Cir. 1998), *cert. denied* 528 U.S. 812 (1999) (finding that "teachers' legitimate expectation[s] of privacy [are] diminished by their participation in a heavily regulated industry and by the nature of their job . . . .").

or death.  *See Chandler*, 520 U.S. at 318-19; *see also, e.g., Von Raab*, 489 U.S. at 660, 669-71;

*Skinner*, 489 U.S. at 628; *Wilcher*, 139 F.3d at 375; *Thomson,* 884 F.2d at 115.

Teachers in Kanawha County Schools perform some duties that relate to safety arising from

their *in loco parentis* role, namely, assisting in breaking up fights between students, helping students

to leave the school building for fire drills, and conducting shelter in place drills.   There is no

evidence, however, that teachers or other employees perform duties that are so "fraught with such

risks of injury to others that even a momentary lapse of attention can have disastrous consequences."

*Skinner*, 489 U.S. at 628.  The type of safety interests articulated by the respondents in justification

of the Revised Policy are not of the same magnitude required to outweigh an employee's privacy

interests.  In fact,

> independent studies overwhelmingly find that people who test positive for prior
> drug use are no more likely than their peers to be involved in on-the-job
> accidents.  These findings . . . owe in large part to the facts that (1) drug testing
> does not detect current impairment, and (2) the vast majority of people who use
> drugs do not do so during work hours.

(Decl. Lewis L. Maltby, Mem.  Pet'rs-Intervenors Supp. Mot. Prelim. Inj., Ex. 1 [Docket 13].)

Moreover, the respondents have provided me with no evidence that moves the risk of the

alleged harm from the realm of speculation into reality.  Dr. Duerring testified that the suspicionless

random drug testing program was motivated by a few specific incidents of drug use as well as a

general prophylactic concern for student welfare.   At the hearing, I repeatedly asked him, and

respondents' counsel, whether the Board had any other justification for the Revised Policy besides

a desire to enact a type of insurance policy.  They did not.  Dr. Duerring testified that the Board had

a fear that teachers could present a danger to students and that employees who were around students

or who made decisions that had a broad effect on children could jeopardize student safety.  He

provided no evidence to substantiate that fear and did not even define it.  He only stated that they were afraid of "any harm that could come to [children] from [employees] either being on alcohol or being on drugs or any other thing that could happen in our district."  (Hr'g Tr. 12/29/08 at 55.)  The respondents also presented no evidence that the unspecified danger that teachers and other employees pose to students is one that is inherent in or permeates their day-to-day job performance.  A train, nuclear reactor, or firearm in the hands of someone on drugs presents an actual concrete risk to numerous people—the same cannot be said for a teacher wielding a history textbook.  The current state of the evidence is such that the safety interests at stake are hypothetical and they cannot be extrapolated to outweigh the employees' privacy interests, which are not diminished in any way by virtue of their employment in a public school.  *See Chandler*, 520 U.S. at 319 ("Nothing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical for Georgia's polity.").  To be clear, I am not suggesting that the respondents are required to wait for an actual injury to occur.  But the respondents must demonstrate that the threat to student safety is one that is a concrete, actual danger that permeates the ordinary job performance of each of the relevant positions.  The respondents may not abandon the Fourth Amendment for nebulous risks. *See Chandler*, 520 U.S. at 319.

The respondents rely heavily on the Sixth Circuit's decision in *Knox County Education Association v. Knox County Board of Education*, 158 F.3d 361 (6th Cir. 1998), *cert. denied* 528 U.S. 812 (1999).  The *Knox* court and the respondents define what constitutes a "special need" in an overly expansive manner not supported by the Supreme Court precedent.  The question is not whether teachers have *anything* to do with safety, but is rather whether the *magnitude* of that role

qualifies as a concrete special need that so outweighs the teachers' privacy interests that Fourth Amendment's protections may be abandoned.

I believe that the *Knox* court was incorrect when it found that the minimal safety interests it discussed qualified as special needs. The *Knox* court found that teachers occupied safety sensitive positions simply because they were entrusted with the care of young children who could "cause harm to themselves or others while playing at recess, [or] eating lunch in the cafeteria . . . ." *Knox*, 158 F.3d at 378. Bumps and bruises of students tussling in the hallways or on the playground are not special needs.[13] *See, e.g., Wilcher*, 139 F.3d at 375; *Int'l Bhd. of Elec. Workers, Local 1425*, 966 F.2d at 525-27; *Int'l Bhd. of Teamsters, Chauffeurs, W. Conference of Teamsters*, 932 F.2d at 1303-04; *O'Grady*, 888 F.2d at 1196-97; *Cheney*, 884 F.2d at 610-15; *Thomson*, 884 F.2d at 115; *Rushton*, 844 F.2d at 566-67; *see also* Schmidt, *supra*, 34 Colum. J. L. & Soc. Probs. at 268.

I therefore **FIND** that there is no evidence on the record to justify the classification of any of these positions as safety sensitive. There is no evidence that these employees hold positions permeated with great and concrete safety risks that are comparable to those faced by "pipeline operators, airline industry personnel, correctional officers, various transportation workers, Army civilian guards, civilian workers in a military weapons plant, Justice Department employees with clearance for top-secret information, police officers carrying firearms or engaged in drug interdiction efforts, and nuclear power plant engineers." *Hatley v. Dep't of Navy*, 164 F.3d 602, 604 (Fed. Cir.

---

[13] Moreover, in deciding *Knox*, the Sixth Circuit failed to consider *Chandler*'s admonition that the danger must be concrete and not hypothetical. Instead of citing to evidence to substantiate its belief that teachers occupy safety-sensitive positions in which a single mistake could create an immediate threat of serious harm to students or its belief that teachers were part of a profession that is heavily regulated for safety, the *Knox* court was distracted by the same parade of horribles presented by the respondents in this case that have no concrete basis in reality.

1998).  The record reveals no real need for random drug testing becasue "the need revealed, in short, is symbolic, not 'special' . . . ."  *Chandler*, 520 U.S. at 322.

I further **FIND** that the relevant Kanawha County Schools employees do not hold positions for which observation would not detect the relevant impairment.  *See Von Raab*, 489 U.S. at 674; *Skinner*, 498 U.S. at 606-07, 629-31; *see also Chandler*, 520 U.S. at 319, 321.  The evidence supports my conclusion that teachers encounter administrators and other staff members throughout the work day.  Moreover, there often are cameras in the hallways of the school, and policemen and drug dogs are sometimes present in the school buildings.  *Cf.* Schmidt, *supra*, 34 Colum. J. L. & Soc. Probs. at 269.

Finally, I also **FIND** that there is no evidence of a pervasive drug problem among employees in those positions.  *See Chandler*, 520 U.S. at 319, 321; *Von Raab*, 489 U.S. at 674; *Skinner*, 498 U.S. at 606-07, 629-31.  Dr. Duerring testified that approximately six to nine employees had tested positive within the past year under the suspicion-based drug testing policy.  He mentioned two additional incidents of a principal charged with possessing cocaine, who was later acquitted, and of a teacher who would come to school inebriated.  The only evidence of adult drug use in the Kanawha County Schools is sparse and anecdotal.  I cannot conclude from this evidence that there is any pervasive drug problem among teachers.  In fact, evidence was presented that "[e]ducation workers are among the least likely group of employees to use drugs.  They are reported to use drugs at lower rates than computer scientists, managers, healthcare practitioners, and lawyers."  (Decl. Lewis L. Maltby, Mem. Pet'rs-Intervenors Supp. Mot. Prelim. Inj., Ex. 1.)

### 3. Balancing

With this Revised Policy, the respondents are seeking to randomly analyze the bodily fluids of most of its employees, who do not have a reduced expectation of privacy, without an individualized suspicion that they are illegal drug users, or abusers of alcohol.  I **FIND** that the respondents did not make a sufficient showing that these employees occupy safety sensitive positions as defined by the Supreme Court or that they have a pervasive drug problem or occupy positions for which observation would not detect the impairment.  *See Chandler*, 520 U.S. at 318-22. On the record before me, I cannot find this is just another step taken to keep children safe like installing keyless entry ID systems or removing the shrubbery outside of the school because this step involves an invasion of the constitutional rights of its employees.

Accordingly, I **FIND** it likely that the respondents are unlikely to succeed on the merits of this case.  *See Direx Israel*, 952 F.2d at 812-13.

### C. Likelihood of Irreparable Injury

The right to be free from unreasonable searches is a fundamental constitutional right, the violation of which is sufficient to demonstrate irreparable harm.  *Covino*, 967 F.2d at 76; *see also Campbell*, 373 F.3d at 839; *Henry*, 284 F.2d at 633.  Unconstitutional drug testing causes irreparable harm because the search and seizure cannot be undone or remedied by an award of monetary damages.  *See Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *Bannister v. Bd. of County Comm'rs of Leavenworth County, Kan.*, 829 F. Supp. 1249, 1252 (D. Kan. 1993); *Amalgamated Transit Union, Local 1227, AFL-CIO v. Sunline Transit Agency*, 663 F. Supp. 1560, 1564 (C.D. Cal. 1987).  "Urinalysis drug testing is an invasive, degrading and humiliating procedure and the injury inflicted by a constitutional violation of this character cannot be remedied by a damage award."

-34-

*Campbell*, 373 F.3d at 840 n.3 (quoting *Am. Fed. of Gov't Employees, Local 1857 v. Wilson*, No. 89-1274, 1990 WL 208749, at *14 (E.D. Cal. July 9, 1990) (internal quotation marks omitted)). Having found that the petitioners are likely to succeed in their Fourth Amendment challenge to the suspicionless random drug testing provisions of the Revised Policy, I **FIND** that they have made a clear showing that they will suffer irreparable harm if I decline to issue an injunction. *See Direx Israel*, 952 F.2d at 812.

### D. Harm to the Respondents

As for the potential harm to the respondents if an injunction is issued, *see Direx Israel*, 952 F.2d at 812, I **FIND** that they are not harmed in any legally cognizable sense by being enjoined from committing an alleged constitutional violation. *Marchwinski v. Howard*, 113 F. Supp. 2d 1134, 1143 (E.D. Mich. 2000) (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)). The injunction prevents the Board and the other respondents from enforcing a policy likely to be found unconstitutional, and if anything, they benefit from such an injunction because they are prevented from violating their employees' constitutional rights and because they will save money that they have planned to spend on the additional drug testing (which they have estimated to cost $36,608 annually). *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (applying this analysis to an alleged First Amendment violation). Moreover, the preliminary injunction enjoins only the random drug testing provisions of the Revised Policy while the remainder of the Policy is unchallenged and is permitted to go into effect.

### E. Whether the Public Interest Favors Granting Preliminary Relief

Finally, the fourth factor I must consider in a request for a preliminary injunction is whether the public interest favors that injunction. *See Direx Israel*, 952 F.2d at 814. An injunction would

prevent the likely infringement of the petitioners' rights under the Fourth Amendment and "upholding constitutional rights surely serves the public interest." *Carandola*, 303 F.3d at 521. I therefore **FIND** that granting the injunction serves the public interest.

### III. Conclusion

For the reasons discussed, I **FIND** that the petitioners have demonstrated that each of the *Blackwelder* factors weighs in favor of **GRANTING** the petitioners' motions for a preliminary injunction. Justice Marshall in his dissenting opinion in *Skinner*, 489 U.S. at 635, warned:

> Precisely because the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great. History teaches that grave threats to liberty come often in times of urgency, when constitutional rights seem too extravagant to endure. . . . [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived emergency, we invariably come to regret it.

I conclude that, on the evidence before me, the suspicionless random drug testing of the relevant Kanawha County Schools employees is just such an unconstitutional excess that threatens the fundamental freedom from unreasonable searches. The respondents therefore are **ENJOINED** from enforcing the random drug testing provisions of the revised Employee Drug Use Prevention Policy pending a trial on the merits.

I also **GRANT** the petitioners' Motion for Waiver of Injunction Bond or for setting Bond at Nominal Amount [Docket 5]. Federal Rule of Civil Procedure 65(c) requires that the party seeking the preliminary injunction give security "in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Because the Fourth Circuit has held that the rule requiring bond is mandatory, I cannot waive bond altogether. *See Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 (4th Cir. 1992). I do have discretion, however, to set the bond at a minimal amount that I consider to be proper. *See*

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).  Because I have found that the respondents will not suffer any hardship or prejudice from the injunction, and because the respondents have not objected to my setting bond at a nominal amount [Docket 19], I **FIND** that a nominal bond of **$100** is sufficient.  My Order of December 20, 2008, **DIRECTED** the petitioners to post this security before 12:01 a.m. on January 1, 2009, which they have done [Docket 22, 25].

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.  The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:        January 8, 2009

Joseph R. Goodwin, Chief Judge